UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>    v.<br><br>VANDEMERE GIPSON,<br><br>                                    Defendant. | Case No. 2:14-cr-00374-GMN-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Suppress – ECF No. 53) |

Before the court is Defendant Vandemere Gipson's ("Gipson") Motion to Suppress Defendant's Statement (ECF No. 53) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4.  The court has considered the Motion, the government's Response (ECF No. 54) and evidence taken at an evidentiary hearing conducted August 17, 2016.  Christopher Oram appeared on behalf of Gipson, and Alexandria Michael appeared on behalf of the government.

## BACKGROUND

### I.    Procedural History

Gipson was initially charged in a criminal complaint on November 6, 2014, with one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He was subsequently indicted on November 19, 2014, on the same charge.  The criminal complaint and indictment arise out of an incident on October 13, 2014.  The complaint alleges that Gipson had two females drive him to various locations in Las Vegas.  When one of the women refused to continue to drive him around, Gipson allegedly pulled a firearm and threatened her.  When Gipson left the vehicle, he left a firearm in the back seat, the woman drove to her residence, and contacted police to recover the firearm.  Police recovered a Smith &

1

Wesson 9mm handgun from the vehicle.  The two women in the vehicle were shown a photo lineup and identified Gipson as the individual who pointed the firearm at one of the women.

Police set up surveillance in the area of D Street and Adams Avenue in Las Vegas and observed Gipson walking with several other individuals.  He was taken into custody.

## II.    The Parties' Positions

In the current motion, Gipson seeks to suppress statements taken after he was taken into custody arguing law enforcement violated his Fifth Amendment rights by interrogating him without first providing *Miranda* warnings.  Gipson maintains that he was interrogated by detectives for forty-five minutes and then again by federal agents.  The agents continued to question him after he unequivocally invoked his Fifth Amendment right to counsel.

The government opposes the motion asserting an evidentiary hearing would establish that on the night of October 24, 2014, detectives conducting surveillance in the area of D Street and Adams Avenue observed Gipson and arrested him for assault with a deadly weapon, possession of a weapon by a prohibited person and other offenses.  The government asserts that detectives gave Gipson *Miranda* warnings and that Gipson stated he understood his rights and waived them.  Detectives questioned Gipson about the facts and circumstances surrounding the October 14, 2014 incident en route to Las Vegas city jail.  During this conversation, Gipson allegedly told detectives that he knew one of the victims and that the firearm recovered by law enforcement was his gun.  He also admitted that there was a "misunderstanding" with the victim, but denied pointing a firearm at her.  The government argues that Gipson received and waived his *Miranda* rights, and denies that he invoked his right to counsel.  Additionally, the government contends it can meet its burden of establishing that Gipson's statements were voluntary, and therefore admissible.

## III.    Testimony at the Evidentiary Hearing

The government called Sergeant Timothy Stovall, North Las Vegas Police Officer Alex Ochoa, and Detective Poulsen.  After the government rested, the court canvassed Mr. Gipson about his knowledge and understanding of his right to testify or not.  Mr. Gipson indicated that after conferring with counsel, it was his decision to testify.

### A.  Testimony of Sergeant Stovall

Sergeant Stovall was a sergeant in the Las Vegas Metropolitan Police Department ("LVMPD") Internal Affairs Division, and had worked for LVMPD for approximately fifteen years as a patrol officer, detective, gang detective, and sergeant.

On October 24, 2014, he was on duty assigned with Detective Berg monitoring a gang funeral for security reasons.  He and his partner were working with North Las Vegas Police Detective Alex Ochoa who was conducting surveillance with Detective Poulsen from LVMPD. Sergeant Stovall and his partner were near the church where the funeral was occurring near the area of D Street and Adams in Las Vegas, which is commonly called the "west side."  There were at least two other surveillance units and probably two or three enforcement units, as well as black and white patrol cars in the area.

Sergeant Stovall and his partner were in an unmarked Crown Victoria in green BDUs, a type of green military uniform that was standard for gang enforcement at the time.

At some point while monitoring the situation, the surveillance unit, Detectives Ochoa and Poulsen, spotted someone they wanted taken into custody.  The detective pointed out that person was leaving the church and described what he was wearing.  Sergeant Stovall also believed he was told the subject had a problem walking or something to that effect, some type of physical impairment such as he walked with a limp.  This information was received over the radio on the gang unit's special gang channel.  Sergeant Stovall could not recall the exact verbiage used in the radio call except that he was asked to take the subject into custody on a case that Detective Ochoa was working.

As a result, Sergeant Stovall and Detective Berg "rolled up" *i.e.* pulled up to the person who was pointed out and asked for his name.  The person replied and was taken into custody after a quick pat down for weapons.  When approaching the individual that Detective Ochoa wanted stopped, Sergeant Stovall and Detective Poulsen stepped out of the vehicle.  They were obviously in police uniforms.  The individual was placed in handcuffs, placed in the undercover vehicle, and transported to where Detective Ochoa and Detective Poulsen were waiting approximately two blocks away.  The individual was transported a short distance away to where

Detective Ochoa and Detective Poulsen were parked because Ochoa and Poulsen were in an undercover capacity and police did not want the vehicle or them to be seen by the general public.

Sergeant Stovall did not recall the person saying anything or asking any questions on the short drive to Detective Ochoa's location. Sergeant Stovall estimated the entire encounter lasted approximately five minutes. Sergeant Stovall did not recall the underlying reason for the individual's arrest. The other detectives may have relayed something, but he could not recall. Once the individual was transported to Detectives Ochoa and Poulsen that was the extent of Sergeant Stovall's interaction with the individual.

On cross-examination, Sergeant Stovall acknowledged that this was a routine matter and that he did not recall some of the details. He recalled that he and his partner were taking the individual into custody. He would have known that there was sufficient probable cause to take the individual into custody and transport him, but did not specifically recall what the probable cause was or what was said on the radio. He was not the case agent and was just following up on the request of another officer. He did not generate a report. His duties on the scene were more security than intelligence. He believed he was driving a Crown Victoria which was his vehicle at the time. Everybody in the area knew that it was a gang enforcement car. He and his partners were not trying to fit in, but were trying to be more overt. They were in uniform so there was no doubt that they were gang unit officers.

His memory is not that good regarding events that occurred approximately two years ago. He could not recall whether he or his partner handcuffed Gipson. He did not recall Gipson saying anything about a business card of an attorney. Sergeant Stovall did not give *Miranda* warnings, and testified that Detective Berg probably did not either. The gang unit has a fairly strict line on who does what in the unit. They would not have *Mirandized* anybody in a case in which they were not the case agent. Sergeant Stovall had no intention of interrogating Gipson and therefore had no need to *Mirandize* him. If Gipson had asked for an attorney, he may have passed that onto the detective, but had no recollection that this occurred. He later testified that he would have passed on information that Gipson asked for an attorney if that occurred, but did not recall that this happened.

1    Sergeant Stovall did not recall searching Gipson's wallet, only that a pat down for

2    weapons was done before he was moved to where Detectives Ochoa and Poulsen were located.

3    On redirect examination, Sergeant Stovall testified that he had no information about the

4    arrest on which to interrogate the person he came in contact with other than there was probable

5    cause for his arrest.

6    **B.  Testimony of Detective Alex Ochoa**

7    Detective Ochoa testified that he was currently employed with the City of North Las

8    Vegas ("NLVPD") as a police officer and had been employed with NLVPD for almost eleven

9    years.  During that time he was assigned to a patrol unit, a problem solving unit, and the Las

10   Vegas Gang Task Force.  At the time of his testimony, he was currently assigned to the LVMPD

11   Organized Crime Bureau.

12   On October 24, 2014, he was on duty with Detective Poulsen conducting surveillance in

13   the area of D and Adams on a funeral in which there were a lot of gang members in attendance.

14   Surveillance was being conducted because gang violence had occurred at numerous funerals.

15   Detective Ochoa and his partner were in a covert capacity to identify potential problems, and if

16   they occurred, to call in patrol officers in the immediate area to take proactive measures before

17   the violence started.

18   Detectives Ochoa and Poulsen were conducting surveillance in an undercover vehicle

19   twenty to thirty yards from the church where the funeral was occurring.  He saw Defendant

20   Vandemere Gipson, whom he identified in open court, leaving the church after the funeral.  He

21   was aware there was probable cause for Gipson's arrest for assault with a deadly weapon, ex-

22   felon in possession of a firearm, and for aiming a firearm at a human being because he was part

23   of the initial investigation of an incident that occurred on October 13 or 14 of the same year.

24   When he saw Gipson leaving the church, he or his partner got on the radio and broadcast that

25   they saw Mr. Gipson with other subjects.  A clothing and personal description was provided

26   along with information Gipson was wanted for assault with a deadly weapon, ex-felon in

27   possession of a firearm, and aiming a firearm at a human being.  This information was relayed to

28   Detective Berg and Sergeant Stovall who took Gipson into custody.

Because Detective Ochoa and his partner were in an undercover vehicle, they did not want to blow their cover in front of the church and had the other detectives arrest him and meet them a couple of blocks away.  Gipson was secured in handcuffs and was brought where the detectives were parked.

When Sergeant Stovall and his partner brought Gipson to their location, Gipson's handcuffs were switched out so that other detectives could have their handcuffs back, and Gipson was placed in the front seat of Detective Ochoa's vehicle with Detective Poulsen sitting in the back seat directly behind Gipson and Ochoa sitting in the front seat.  Detective Ochoa testified that he immediately read Gipson his *Miranda* rights which Gipson said he understood and wished to waive.  The *Miranda* rights were read from memory as is Detective Ochoa's routine practice.  Gipson said he understood and wished to speak with the officers.  The only individuals present in the vehicle were Gipson, Detective Ochoa and Detective Poulsen.

Detective Ochoa described Gipson as being very animated and asking a lot of questions about why he was under arrest.  After Gipson was told why he was under arrest, he kept saying "I don't know what you're talking about, I don't know what you're talking about."  Gipson was animated, but not belligerent, very upset about being in custody, making a lot of noise and moving around a lot, speaking loudly.

Detective Ochoa tried to get an interview from Gipson which was difficult because of how animated he was.  Detective Ochoa finally told Gipson that he had a cooperating witness, a victim that had picked him out of a photo lineup, and forensic evidence.  Because Gipson was so animated, and visibly upset it was very hard to take control of the conversation and establish a rapport.  After providing information about the investigation, Detective Ochoa showed Gipson the photo lineup that was completed and said that officers had a lot of evidence against him.  Part of the case file was in the vehicle.

After Ochoa shared information about the investigation, Gipson stated that it was a big misunderstanding.  Gipson continued his animated demeanor, admitted that he knew one of the women involved in the incident on October 13 or 14, but adamantly denied that he ever pointed a

gun at anybody.  Gipson admitted to possessing the firearm on the date of the incident.  After making these admissions, Gipson's demeanor changed and "started de-escalating."

At this point, Detective Ochoa and Gipson started talking.  Gipson continued being adamant about not pointing a gun at anybody, but admitted that the firearm was his and his fingerprints would be found on the firearm.  Detective Ochoa estimated this conversation lasted approximately ten minutes.  The conversation occurred in the presence of Detective Poulsen.

Detective Ochoa identified government's proposed Exhibit 1 as the report he drafted following his interview of Gipson.  It refreshed his recollection that the physical evidence Ochoa discussed with Gipson included a firearm and Gipson's hat.  The report also indicates that *Miranda* rights were administered.  The report does not indicate that Gipson asked for an attorney at any point "because he did not."

After Gipson made admissions, he started talking about how he had information about robberies, drugs, guns, and murders.  Gipson wanted to become a cooperating individual to seek some lenience in his case.  Detective Ochoa could not recall if he or Detective Poulsen called Special Agent Marty Yates from Homeland Security.  Special Agent Yates was called because, with Mr. Gipson's criminal record, there was no way that NVLPD or LVMPD would sign up individuals like Gipson as a cooperating individual.  Neither Detective Ochoa nor Detective Poulsen could do this, so they called Special Agent Marty Yates to see if Homeland Security was interested.  Gipson had not yet been booked into custody at the time Yates was called.

Once Gipson started talking about providing information and becoming a cooperating individual, Detective Ochoa and Poulsen "never revisited" the case for which Gipson was under arrest.  Sergeant Stovall and Detective Poulsen waited in the parking lot of the Las Vegas City Jail for Special Agent Yates to arrive.  When Yates arrived, Detective Poulsen stepped out of the vehicle so only Ochoa, Yates, and Gipson were in the car.  Gipson stated he had information on drugs, guns, and homicide.  Special Agent Yates asked for more information and details.  Gipson responded that he could not do anything from the inside of jail and needed to be out.  This conversation went back and forth between Yates and Gipson and "went nowhere."  Gipson did not reveal any information about robberies, murders or anything, and Special Agent Yates made

no promises.  Detective Ochoa estimated the conversation between Gipson and Yates lasted approximately ten to fifteen minutes.

Detective Ochoa did not put any information about Gipson offering to cooperate in his police report because of the need to protect individuals offering to provide information.  At no point during his encounter with Gipson did Gipson ask for an attorney, to speak to a family member, or to use the phone.

On cross-examination, Detective Ochoa testified that from the time he first observed Gipson coming out of the funeral until Gipson was booked into the Las Vegas City Jail, was approximately an hour to an hour-and-a-half.  The funeral was one in which law enforcement expected a large presence of gang members.  The deceased as Al Jarreau Cross who was a gang member shot by North Las Vegas Police.  Police were watching the funeral because it was a gang related funeral.

Detective Ochoa just happened to have evidence from the case he was investigating concerning Gipson in his vehicle.  He was still proactively working the case and had the case file with him.  He believed that Gipson walks with a limp.  Detective Ochoa reiterated that Gipson never asked for an attorney or to call a family member.  Gipson did not say there was an attorney's card in his wallet and that he wanted detectives to call the attorney.

No report documents that the detectives called Special Agent Marty Yates.  Gipson was not taken to the Federal Bureau of Investigation for an interview.  Detective Ochoa estimated it took approximately twenty minutes for Detective Yates to arrive at the parking lot of the Las Vegas City Jail.  At the time of the conversation between Gipson and Yates, Detective Ochoa did not have a tape recorder in his vehicle.  He had *Miranda* waiver forms, but most likely "did not have them in his undercover vehicle."  Detective Ochoa does not keep a *Miranda* card on him, and provided *Miranda* warnings from memory.

Detective Ochoa reiterated that he did not remember Gipson asking for a lawyer.  Based on his experience, people usually ask officers to call a girlfriend or a wife or a mom when they know they are going to be taken to jail, but did not recall Gipson ever asking for anybody.

8

Ochoa estimated that the distance between D and Adams where Gipson was taken into custody and the Las Vegas City Jail was approximately four miles and a ten to fifteen minute drive.  Special Agent Yates was called because at the time Detective Ochoa's unit was working with Homeland Security in a partnership, and Gipson was claiming that he wanted to give information on other cases.  Ochoa called Yates because Gipson "could give me the world, but I couldn't give him anything in return because of his criminal history."  Yates was contacted because he might have been able to offer something to Gipson.

Detective Ochoa only questioned Gipson regarding the incident that was alleged on October 13 or 14, 2014, and nothing else.

The court inquired what *Miranda* warnings were administered.  Detective Ochoa responded that he told Gipson "You have the right to remain silent.  Everything you say can and will be used against you in a court of law.  You have the right to the presence of an attorney.  If you cannot afford an attorney, one will be provided to you before any and all questioning."  Detective Ochoa then asked if Gipson understood these rights and if Gipson wished to speak with him.  Gipson responded affirmatively.

**C.  Testimony of Detective John Poulsen**

Detective Poulsen is currently employed as a detective in the Convention Center Area Command with LVMPD and has been employed by LVMPD for a little over ten years.  He has been on regular patrol, the problem solving unit, a gang detective, and is currently a patrol detective.

On October 24, 2014, he was on duty assigned to working a funeral on the west side of Las Vegas around D Street near a church.  He and other intel teams were on duty.  Detective Poulsen was partnered with Detective Ochoa at the time.  He and Ochoa were set up in a plain car to the east side of the church and were aware of other units and officers in the area.  He "guesstimated" that there were probably six other cars, some with two officers and some with a single officer.  Law enforcement regularly goes out to funerals of known or documented gang members as "intel gathering" or as a precaution to any type of retaliation or violence.  He identified Vandemere Gipson as a person he had contact with that day in open court.  He or

Detective Ochoa alerted the enforcement units in the area and uniformed gang detectives that they had probable cause to arrest Gipson for an assault with a deadly weapon.  Gipson's clothing description and direction of traffic were described, and the request was made for officers to stop and place Gipson into custody.  Sergeant Stovall and Detective Berg stopped Gipson and confirmed it was him over the radio.  Poulsen and Ochoa had Stovall and Berg meet them around the corner so as not to make a scene in front of potential other friends, family, and anybody who might become volatile.  The other detectives arrived and got Gipson out of the car.  Gipson's handcuffs were switched out and Gipson was placed in the front seat of their undercover vehicle. Poulsen was in the back seat, Ochoa was in the driver's seat, and Gipson was in the passenger front seat.

Gipson was asking what he was being arrested for, and Detective Ochoa explained what it was for.  Ochoa read Gipson his *Miranda* warnings and started on the way to jail, but also started talking to Gipson, questioning him.  Detective Ochoa did all of the questioning. Detective Poulsen did not believe he did any questioning because it was a North Las Vegas case. Poulsen was present when Ochoa took the initial report, but let Ochoa take the lead because he knew more about the case than Poulsen did.

Ochoa asked Gipson if he had any recollection of the night of the incident and the people who were involved.  Gipson initially said he didn't know anything about it, he wasn't there and had no idea what officers were talking about.  Gipson was shown a photo lineup and told that police had witnesses and the photo lineup proved a witness picked him out of a photo lineup. Gipson then admitted to being there and knowing the subjects, being in the car,  and possessing a gun, but stating there was some type of misunderstanding and that he never pointed a gun at anyone.

Detective Ochoa showed Gipson the photo lineup and other information from the case. Once this information was relayed to Gipson, in the detective's opinion, Gipson "kind of realized that we had more than he thought we knew" and started to talk about it.  Detective Ochoa started to talk to Gipson about possibly helping himself out, if he knew anything else that could help with the charges later on down the line.  This conversation occurred on the drive to Las Vegas

City Jail over approximately ten to fifteen minutes.  Officers had to wait for Special Agent Yates who was going to come down and talk with Gipson in the car.  The waited another fifteen to twenty minutes after arriving at North Las Vegas City Jail.

At no point in time did Detective Poulsen recall Gipson asking for a lawyer, or saying anything about a lawyer.  At no point in time did Gipson fail to respond to Ochoa's questions.  There were no threats being made.  No officer drew their weapon and no physical force was used to get Gipson to admit anything.

Detective Ochoa created all the paperwork and reports for this arrest.

Detective Poulsen was present when Special Agent Yates arrived.  Poulsen got out of the vehicle so that Yates could get in.  He estimated that it was fifteen to twenty minutes before Yates arrived and that Yates and Ochoa were in the vehicle with Gipson another ten to fifteen minutes.

On cross-examination, Detective Poulson estimated it was approximately forty-five minutes to an hour between the time Gipson was arrested and booked into the city jail.  He believed that Detective Ochoa initiated the conversation about Gipson giving information to help himself out.  This is because "we usually give everybody a chance that there's always something bigger out there, that if we can help the defendant out, we will if we can get something bigger out of it.  So we usually will throw that out there."

Detective Poulsen did not call Special Agent Yates, but believed that Ochoa did.  It was a long time ago and he could not recall the specifics.  He did not have much of a memory of the conversation between Detective Ochoa and Gipson because as far as he could recall, there was nothing really specific said.  It would stand out in his mind if a homicide was discussed.  However, Detective Poulsen testified it's not uncommon that a suspect under arrest will throw out that they know somebody was murdered, or know somebody that killed somebody.  "It happens more times than not."

Detective Ochoa gave Gipson his *Miranda* warnings from memory.  *Miranda* warnings were given right after Gipson got in the car and started asking why he was arrested.  Poulsen recalled Ochoa showing Gipson the photo lineup.

1    Detective Poulsen did not recall any conversation about Gipson wanting to talk to a

2    family member.  This is not something that he would usually try to remember anyway.  Gipson

3    was agitated when he got into the car and wanted to know why he was arrested, but was not

4    agitated the entire time.  Gipson wasn't screaming or being combative.  Detective Poulsen

5    specifically recalled that when Gipson got in the car he was very agitated because he wanted to

6    know why he was being arrested.  Detective Poulsen was in the back seat listening to the entire

7    conversation between Detective Ochoa and Gipson, but could not recall any specifics of the

8    conversation.  However, he did remember that Gipson put himself at the scene and admitted that

9    he was an ex-felon in possession of a firearm.

10    The government rested after Detective Poulsen testified.

11    Mr. Oram addressed the court inquiring about the scope of cross-examination the

12    Defendant would be subjected to if he elected to take the stand.  He cited *United States v.*

13    *Simmons*, 390 U.S. 377 for the proposition that a Defendant can testify regarding Constitutional

14    violations without being subjected to cross-examination regarding the facts of the case.  In

15    response to a question from the court, Mr. Oram indicated he intended to elicit testimony only

16    about issues before the court and not the underlying basis of the investigation for which Gipson

17    was under arrest.  Mr. Oram also stated he intended to inquire about whether Gipson made the

18    statements that the Detectives claim he made.  The court indicated that to that extent the

19    government would be permitted to cross-examine.  Government counsel agreed that Gipson

20    could testify at the suppression hearing without being cross-examined on the nature of the

21    underlying investigation or the offense charged in this case.

22    However, the court advised Mr. Gipson and his counsel that if Mr. Gipson testified at

23    trial in a manner inconsistent with his testimony at the suppression hearing, the government may

24    be able to impeach him with prior inconsistent testimony.  Mr. Oram confirmed that he had

25    discussed these issues with Mr. Gipson. Mr. Gipson confirmed Mr. Oram had discussed these

26    issues with him and indicated he wanted to testify after discussing the matter with counsel.

27

28

### D.  Testimony of Vandemere Gipson

Mr. Gipson testified that he was arrested in this case coming out of the church where he had attended a funeral for his cousin, Al Jarreau Cross.  His cousin had been shot by a North Las Vegas Police Officer.  Gipson was walking around the corner and got pulled over by a gang unit behind the church with two other people.  Officers followed Gipson and his friends and pulled them over in the back of the church telling Gipson to "get on the car."  The officer asked if he was Vandemere Gipson and whether he had any proof of identity.  Gipson gave the officer his wallet and told him his name was Vandemere Gipson.

Gipson asked why he was being pulled over.  By pulled over, he meant stopped.  The officer started putting cuffs on him.  Gipson asked the officer if he could talk to his uncle, or whether somebody could go in the church and tell his uncle that he was being arrested, or whether the officer could grab a card out of Gipson's wallet and call his lawyer.  Gipson had a card in his wallet for Attorney Gregory Knapp.  Knapp used to be an Assistant District Attorney, but is now a defense lawyer.

Gipson testified that he did not see the officer who talked to him about his wallet in court.  The officer who talked to him had darker hair and the officer who grabbed his wallet "wasn't even in here."  He did not recall the names of the officers who stopped him.  After an officer grabbed his identification, he ran a check on the walkie-talkie and talked to someone and then put Gipson in the car and drove him two or three blocks.  Three or four officers came to the car and took him out.  One officer asked him to switch handcuffs and then put Gipson back inside the police car.  An officer was in the front.  The officer in the front was the one who came to testify today.  He was the only officer in the car at the time.  Another officer sat behind him in the patrol car and got to the car two or three minutes later.

Gipson denied he was upset, but said he was disappointed and not happy about being arrested.  He was taken to city jail.  On the way to the jail he was being questioned by the police officer in the front seat, and the police in the back seat about shooters in the neighborhood.  He was asked whether he knew who did the shootings.  When Gipson said he had no information,

the officers told him that he knew certain people and that he did the shooting with and was one of the people doing the shooting that they had information on.

Gipson recognized Detective Ochoa as an officer questioning him, but did not recognize the officer who was sitting behind him in the car, because the officer who testified was bald and the officer who sat behind him in the car had hair.

The officers were questioning him about cases unrelated to this federal charge.  They were questioning him about shootings in the neighborhood.  Ochoa asked Gipson whether he believed that the police really shot Al Jarreau Cross and how he got shot.  Ochoa stated that Al Jarreau pointed a gun at him and that's why he shot him.

Gipson testified he knew what *Miranda* warnings are, but denied that *Miranda* warnings were given to him on the date of his arrest.  *Miranda* warnings were not given to him the first time nor the second time when he got in the car.  *Miranda* warnings were not given from the entire time he was arrested until he was booked into the jail.

Gipson was questioned about this federal case.  He was shown evidence, a lineup, and was told that he had been picked out of the lineup by the victim.

At some point, a special agent arrived.    Gipson did not request that he be present.  Gipson did not know how the special agent came to be there.  An officer requested Agent Marty, but he did not know why.  Gipson denied that he asked to be a cooperating witness, or provide information.

The officer in the back seat was saying, "you might want to say that you have the gun, admit that you have the gun.  You would tell on your mama."  That is when the conversation got heated in the car.  The comment made him mad.  Gipson said he would never do anything like that and was "not going to tell on nothing."  This was before Special Agent Yates arrived.

Gipson adamantly denied that he gave officers any kind of information about this crime or any other crime.  He estimated that it was an hour to an hour-and-a-half between the time he was first arrested and the time he was booked in jail.  He estimated that they sat outside the jail for thirty to forty minutes.

Gipson carried Attorney Greg Knapp's business card in his wallet.  He asked officers to call Knapp on the number on the business card four or five times and asked for a lawyer four or five times.  He asked the first officer who arrested him "like two or three times" and then asked the officer in the car "like two times" to call a family member and the lawyer on the card.  He talked to Detective Ochoa about calling a family member because Gipson's uncle was still in the church giving a sermon.

The only statements he made to Detective Ochoa were that the gun was not his, and he did not know what Ochoa was talking about.  He did admit that he knew Rena.  He adamantly denied that he admitted the gun was in his possession or words to that effect and stated he told officers he had nothing to do with the incident.  At the time he was in the car, he understood that felon in possession of a firearm was a serious offense.  He reiterated that he asked for a lawyer four or five times.

When Special Agent Yates arrived, he kept asking Gipson if he knew anything about any murders, and if he did, Yates could help Gipson out.  Gipson responded that he didn't know anything about murders.  This conversation kept going back and forth with Gipson denying that he knew anything about murders.  He estimated this conversation occurred for twenty to twenty-five minutes.  He did not know the individual as Special Agent Yates, only Marty.

On cross-examination, Gipson testified that he was pulled over in the area of D and Adams after coming out of the church following his cousin's funeral by gang units.  He did not know the officers, but recognized they were a gang unit from their "green suits."  Two officers initially came in contact with him.  They asked for his identification, and he identified himself as Vandemere Gipson.  First, he was told to get on the car, then asked if he was Vandemere Gipson, then asked for identification. Gipson gave them his wallet.  The only thing in his wallet was his identification.  There was no money, just his identification and a card that Gregory Knapp gave him.  He later testified he did not give the officers his wallet.  Rather, they grabbed it or got it from him.  When asked about this inconsistency, he testified "I think they got it off of me."

Gipson was arrested and placed in handcuffs.  He asked the officers if they could go inside the church and get his uncle.  Gipson then asked officers if he could call his lawyer.

15

1    Gipson asked the officers if they could grab the card in his wallet and call his lawyer.  Gipson

2    did not have a phone, so he asked one of the officers to call his lawyer.

3         Gipson was driven two or three blocks away at which point he was switched from the

4    first car to the second car.  He recognized and remembered Officer Ochoa who sat in the front

5    seat with Gipson.  The other detective was in the back seat.  Gipson again denied that he was

6    upset, only disappointed or "down or something" about being arrested.  He had just come from a

7    funeral for his cousin and was sad.  He was driven by the officers to city jail.  On the ride to jail,

8    the officers were speaking to Gipson.  Gipson testified that he asked why he was being arrested

9    before being transported to the jail, while being stopped on the street.

10        When he got in the car with Detective Ochoa, he asked why he was being arrested and if

11   Gipson could call a family member, or could officers call the lawyer on the card, or could

12   Gipson call the lawyer on the card.  Gregory Knapp gave Gipson the card and told Gipson

13   anytime he got arrested to give officers the card and ask them to call him, and that's what he did.

14        Gipson was familiar with *Miranda* warnings and has heard them read a lot of times

15   before.  When asked how many times, he testified "a whole lot," more than ten.  He was aware

16   that prior to speaking with law enforcement, they were required to read *Miranda* warnings when

17   someone is in custody.  No one gave him *Miranda* warnings, but he spoke to them despite this

18   fact.  Gipson asked the officers why he was being arrested.  Gipson acknowledged that he told

19   them some information about the incident and that he had nothing to do with it, and that it was a

20   big misunderstanding.  Ochoa kept asking questions and Gipson denied everything.  As some

21   point, Ochoa showed Gipson a lineup where he had been picked out.  Gipson could not recall

22   whether Ochoa told him that Ochoa had a witness who saw Gipson holding the gun.  Gipson also

23   did not recall Ochoa saying he had a cooperative witness and a victim.  Gipson did recall Ochoa

24   saying there was evidence located along with the firearm and Ochoa had found Gipson's hat.

25   Gipson also recalled telling Ochoa that he knew Rena, but not the other person.   Gipson

26   acknowledged that he told Ochoa he was in the car.  Gipson denied he told Ochoa that the gun

27   was his, but he never pointed it at anyone.  He also denied saying that his fingerprints would be

28   located on the firearm.

Gipson asked Ochoa if he could call his uncle when he first got in the car when Ochoa kept asking Gipson about murders and the murder of Al Jarreau Cross.  Ochoa did not ask Gipson about his case at the beginning, but asked about Al Jarreau Cross, the shooting, and shooters in the neighborhood.  Gipson asked for his uncle because he was being arrested.

Ochoa then started saying that he had evidence that Gipson had a pistol, a gun, and assault with a deadly weapon or something like that.  Gipson wanted Ochoa to call an attorney or his uncle because he was being questioned about a shooting in the neighborhood, saying Gipson was involved in it.

Counsel for the government reminded  Gipson that he first testified that he asked to speak with his uncle immediately after he was initially stopped.  Gipson responded that he did not know if it was during that time or at the time Ochoa said he had evidence of an incident involving an assault with a deadly weapon that he first asked to speak with his uncle or an attorney.  He testified "it was in between one of them times right there."  He answered Ochoa's questions even though he knew officers were supposed to read him *Miranda* rights and had not done so.  He testified that he was read *Miranda* rights all the time, but that this time it was not on his mind.  He was just coming out of a funeral and was not thinking of his *Miranda* rights. "I didn't think I did nothing wrong at the time." Gipson testified that he didn't say anything wrong to the officers, and felt that he didn't say anything wrong to them in terms of him being in the car with Rena and knowing her.  Gipson admitted that he told Ochoa he was in the car and knew Rena.   When asked again whether he told Ochoa the incident in the car was a big misunderstanding Gipson initially denied he ever said anything to Ochoa about it being a big misunderstanding, and then testified he did not recall saying it was a big misunderstanding.

When Special Agent Yates arrived, Yates did not ask Gipson anything about the October 14, 2014, incident.  He testified the conversation with Yates lasted a long time and Yates asked him all types of questions.

Gipson admitted he had prior felony convictions including a possession of controlled substance in 2006, obtaining and using personal identification information of another in 2007,

larceny from a person in 2011, and possession of a controlled substance with the intent to sell in 2011.  He was in High Desert in 2012.

Although he was familiar with his *Miranda* rights, he was not thinking about them at the time Ochoa questioned him.  They were not going through his mind at the time.

On redirect, Gipson testified that he had several felony convictions, "even maybe more".  He acknowledged that he talked to officers.  At no time did he tell the officer that he "had the right to remain silent and was going to invoke that right."  From the time he was apprehended outside the church until he got to city jail, he asked the officers to contact Greg Knapp four or five times.  He initially said he asked the officers to call his uncle two or three times, then four or five times.

In response to questions by the court, Gipson testified that he did not recognize Sergeant Stovall as one of the officers who initially stopped him coming out of the church because it had been so long.  He also did not recognize Detective Poulsen as one of the two officers that stopped him.  Gipson clarified that he was not saying it was not them, only that he didn't recognize them at this time.  One of the guys with the gang unit had dark hair at the time, a crew cut.  The guy who was in the back seat when Gipson was initially stopped had hair on his head.  Gipson did not see that officer in court today unless he cut his hair.  Gipson did recall a Crown Vic.  Everybody in the neighborhood knows the Crown Vic is a gang unit, but other people drive them too.  He recognized the officers as gang officers from their green uniforms which had a big Sheriff's sign on it.  The officer in the back seat with Ochoa was wearing plain clothes.

Gipson did not know why Special Agent Marty showed up asking questions about murder cases.  Gipson was in the car when either Ochoa or the officer in the back seat called Yates.  Ochoa, the officer in the front seat, said a detective from Homeland Security or the FBI wanted to come talk to Gipson.  "Since I've been around in a gang for so long that I might have some information for him, you know what I mean.  So we sat down and waited on him until he got there."

On re-cross examination, Mr. Gipson said he'd had prior contact with Detective Ochoa in 2011.  He believed Ochoa picked him and a girlfriend up at the bank off of Washington and

Martin Luther King, but could not recall why.  He recalled the conversation because Ochoa let Gipson smoke a cigarette, then sat him on the side of the curb before arresting him.

**DISCUSSION**

**I.   Defendant's Statements**

The government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).  The government must also establish, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda*.  *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

**II.      The Requirement for *Miranda* Warnings**

*Miranda* warnings are necessary when a suspect in custody is interrogated by police.  *See Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. at 300-01.  The Supreme Court and courts of appeal have repeatedly emphasized that many types of questions are not considered interrogation and do not require *Miranda* warnings. For example, questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings.  *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).  Asking a suspect questions regarding general biographical information is not interrogation.  *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

A valid Miranda waiver must be voluntary, knowing and intelligent.  *United States v. Garibay,* 143 F.3d 534, 536 (9th Cir. 1998) (citing *United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir. 1986)).  There is a distinction between a claim that a *Miranda* waiver is not voluntary and a claim that a *Miranda* waiver was not knowing and intelligent.  The voluntariness of a waiver has always depended on the absence of police overreaching.  *See Connelly,* 479 U.S. at 170.  Although courts often merge the two-pronged analysis, the components should not be conflated.  *See Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008).  First, a valid *Miranda* waiver requires a showing that it was voluntary and the product of a free and deliberate choice rather than the product of intimidation, coercion, or deception.  *Moran v Burbine*, 475 U.S.412, 421 (1986).  Second, a valid *Miranda* waiver must have been made with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it.  *Id*. "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived."  *Id*.

A valid waiver of *Miranda* rights depends upon the "totality of the circumstances including the background, experience, and conduct of defendant."  *Garibay* at 536.  A defendant's familiarity with the criminal justice system is a factor the court may consider in evaluating whether a valid *Miranda* waiver occurred.  *United States v. Jacques*, 744 F.3d 804, 815 (1st Cir. 2014) (finding valid *Miranda* waiver in part because defendant was a "veteran of the criminal justice system"); *United States v. Plugh*, 648 F.3d 118, 128 (2nd Cir. 2001) (finding valid *Miranda* waiver in part because defendant was familiar with *Miranda* rights as a state corrections officer); *United States v. Pruden*, 398 F.3d 241, 246 (3rd Cir. 2005) (finding valid *Miranda* waiver in part because defendant had experience with the criminal justice system on numerous prior occasions); *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005) (finding valid *Miranda* waiver in part because defendant with low IQ and mental disorders was "street smart" and had been given *Miranda* warnings on previous occasions); *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994) (finding valid *Miranda* waiver in part because defendants was familiar with the criminal justice system as a result of his extensive criminal history); *United States v. Doe*, 226 F.3d 672, 680 (6th Cir. 2000) (finding valid *Miranda* waiver in part because 17-year-old defendant had substantial history in the juvenile justice system); *United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2001) (finding valid *Miranda* waiver in part because defendant had "substantial experience with the criminal justice system"); *Grey v. Norman*, 739 F.3d 1113, 1116-17 (8th Cir. 2014) (finding valid *Miranda* waiver in part because defendant was familiar with criminal justice system).

However, a defendant's familiarity with the criminal justice system and *Miranda* warnings does not eliminate the need to administer *Miranda* warnings.  *See, e.g., United States v. Longbehn*, 850 F.2d 450, 453 (8th Cir. 1988); *United States v. Street*, 472 F.3d 1298, 1310-12 (11th Cir. 2006) (finding no valid waiver when incomplete *Miranda* warnings were administered to a police officer).

20

### III.   Voluntariness.

A statement must be voluntary to be admissible. *Lego v Twomey*, 404 U.S.477, 483-485 (1972). A statement is voluntary where it is "the product of a rational intellect and free will." *S e e   United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (*citing Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)).   It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. *See United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Connelly*, 479 U.S. at 168.

In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v Fenton, 474* U.S. 104, 112 (1985) In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See Connelly*, 479 U.S. at 167.   The court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne." *Id*.  In assessing the voluntariness of a confession, the court considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Gifferson v. United States*, 530 U.S. 428, 434 (2000).

Here, Gipson does not claim he received inadequate Miranda warnings, or that he did not understand the warnings that were administered.  Gipson also does not claim that he was coerced or intimated or that his will was overborne. Rather, he claims he received no warnings at all before being subjected to custodial interrogation, and that he asked police to call a lawyer and/or his uncle. It is undisputed Gipson was immediately taken into custody and arrested by Sgt. Stovall and his partner, Detective Berg. The dispute is whether Gipson received and waived Miranda rights Detective Ochoa testified he gave Gipson, and whether Gipson invoked his right to counsel.

1

IV.    **Findings and Recommendation**

2         Resolution of this motion to suppress involves credibility determinations.   Detective

3   Ochoa and Poulsen testified that Ochoa provided Gipson with *Miranda* warnings prior to any

4   questioning.   Gipson maintains *Miranda* warnings were never administered.   The court found

5   both Ochoa and Poulsen credible that *Miranda* warnings were provided to Gipson as soon as he

6   was brought to their vehicle and prior to any questioning.   Ochoa provided the *Miranda* warnings

7   from memory.    The court found Detective Ochoa credible that Gipson acknowledged

8   understanding his rights and agreed to talk with him.   Both Ochoa and Poulsen testified that

9   Gipson was agitated about being arrested, but not belligerent. Gipson repeatedly asked why he

10   had been arrested and was told.   Detective Ochoa testified that it was difficult to initiate the

11   interview because of how animated Gipson initially was.   Detective Poulsen testified that once

12   Ochoa explained the charges, and the evidence that his investigation had uncovered, Gipson "de-

13   escalated" and seemed to understand that officers had more of a case than Gipson initially

14   thought.  It was at this point that Gipson offered to provide information.

15         Sergeant Stovall had a poor memory of the details of the day of Gipson's arrest.

16   However, this is understandable in that this was not his investigation. Stovall and his partner

17   were in the area to provide security and gather intelligence in the area of a funeral for a gang

18   member. Sgt. Stovall and Detective Berg were asked to take Gipson into custody on Ochoa's

19   case.   Thus, the court Sgt. Stovall credible that he did not question Gipson about Ochoa's

20   investigation because he had no knowledge of the investigation on which he could question

21   Gipson, and because he would not conduct an interview in a case in which he was not the case

22   agent.  Rather, the only questions Sgt. Stovall  sked Gipson was his name, and whether he had

23   identification on him to confirm that he was the person Ochoa wanted taken into custody.   The

24   court found Sergeant Stovall credible that he would not have *Mirandized* anyone in a case in

25   which he was not the case agent.  The court also found Sgt. Stovall credible that he did not recall

26   Gipson asking for a lawyer, asking Stovall to contact the lawyer on Gipson's behalf, or for

27   Stovall to contact his uncle.

28         Gipson steadfastly maintained that *Miranda* warnings were not administered at any point

in time on the day of his arrest.  However, Gipson also had a poor recollection of some of the

events surrounding his arrest and contact with law enforcement officers that day.  He did not recognize either Sgt. Stovall or Detective Poulsen as officers with whom he had contact that day. Although Gipson's contact with Sgt. Stovall was only for a short period of time, he was with Detective Poulsen between 45 minutes to an hour and a half, depending on whose recollection was more accurate.

Gipson also contradicted himself in his testimony in several respects.  First, he went back and forth about the circumstances in which the officers who stopped him had possession of his wallet containing his identification.  According to Gipson the only thing in the wallet was his identification and Attorney Gregory Knapp's business card. Gipson went back and forth about whether he voluntarily handed his identification or his entire wallet to one of the officers who stopped him, or whether they "grabbed" or "took it off him."  Second, Gipson had difficulty and changed his testimony about which officers were asked to call attorney Knapp, and/or his uncle. At first Gipson said he asked the first officer who arrested him two to three times to call a family member and the lawyer.  On cross-examination, he testified that he asked for a lawyer and/or a family member two to three, or four to five times after he was taken to Ochoa and Poulsen's vehicle.  When confronted with this inconsistency on cross examination, he responded that he did not know whether he first asked the arresting officer or Detective Ochoa to call attorney Knapp and/or his uncle.  Gipson eventually testified he didn't really recall and that it was in between one of those two times.

More significantly, Gipson repeatedly changed his testimony about whether he told Ochoa that the incident on October 13th or 14th on which he was being questioned was a "big misunderstanding."  Gipson testified on direct that he told Ochoa he knew Rena and admitted being in the car with her.  Gipson also initially admitted he told Detective Ochoa that it was all a "big misunderstanding."  When asked again on cross-examination, he denied telling Detective Ochoa the incident was a big misunderstanding.  He finally testified he could not recall whether he told Ochoa the incident was a big misunderstanding.

Additionally, Gipson adamantly denied that he told Detective Ochoa he wanted to give information and agreed to cooperate with police.  However, the court found Detectives Ochoa and Poulsen credible that Gipson offered to provide information about drugs, guns and

homicides after he was confronted with evidence against him in this case.  Both Detectives Ochoa and Poulsen testified that because of Gipson's extensive criminal record, neither of their departments would have agreed to offer Gipson anything in return for his cooperation.  This was why they called Special Agent Yates, a federal law enforcement officer they worked with, to determine if Homeland Security was interested.  It makes no sense at all for the detectives to call Special Agent Yates, and wait fifteen to twenty minutes in the parking lot of the North Las Vegas jail for him to arrive if Gipson did not offer to cooperate and provide information.  The court found Detectives Ochoa and Poulsen credible that they did not ask Gipson any questions about this case after Yates arrived, and that Yates did not ask Gipson any questions about this case.  Indeed, Gipson does not claim that Special Agent Yates asked him any questions about this case.

The court also found the testimony of Detectives Ochoa and Poulsen credible that the fifteen to twenty minute conversation between Gipson and Special Agent Yates "went nowhere." Gipson repeatedly told Yates that he couldn't do anything inside the jail.  It seems clear Gipson was trying to avoid being booked into jail with the suggestion he could provide information without actually providing any information. Special Agent Yates repeatedly asked what information Gipson had.  Gipson offered nothing and Yates offered nothing.  After going around in circles like this for fifteen to twenty minutes, the interview ended.

Gipson was candid in testifying on direct and cross-examination that he had at least three felony convictions, volunteering "maybe more."  He also acknowledged that he had received *Miranda* warnings in the past "a whole lot," more than ten times.  His familiarity with the criminal justice system and his *Miranda* rights weighs in favor of a finding his waiver and agreement to talk with Detective Ochoa was knowing and intelligent.

In short, the court finds that under of the totality of the circumstances in the record Gipson received and waived *Miranda* warnings prior to questioning about the charges for which he was arrested, including this federal felon in possession of a firearm charge. His waiver was voluntary, knowing and intelligent. The court simply did not believe Mr. Gipson that *Miranda* warnings were not administered, or that he asked for a lawyer, or asked officers to contact his uncle in the church.  Gipson's own memory of the events was poor.  He did not believe he had

contact with Stovall or Poulsen on the day of his arrest.  He did not deny that he did have contact with these officers, only that he did not recognize either officer.  While it is understandable that he did not recognize Stovall with whom he only had contact for approximately five minutes from the time of his arrest until he was transported to Detective Ochoa and Poulsen, Gipson was with Detective Poulsen 45 minutes to an hour-and-a-half depending on whose recollection is more accurate. Gipson's account about when he first asked for an officer to call the attorney on the card in his wallet and/or his uncle changed on direct and cross examination. Gipson gave conflicting testimony about whether he gave his identification or his entire wallet to the officers who stopped him or whether they grabbed the wallet or "took it off him." More importantly, Gipson's ever changing testimony about whether he told Detective Ochoa the October 13 or 14 incident was a "big misunderstanding" also substantially undermined his credibility.

 Gipson does not claim that he was threatened, coerced, or intimidated.  There is no evidence in the record to support a finding of coercive police conduct.  Accordingly, the court finds Gipson received and waived valid *Miranda* warnings and voluntarily answered questions.

**V.  Conclusion**

The government has met its burden of showing *Miranda* warnings were given prior to custodial interrogation, that a valid waiver of *Miranda* rights occurred, and that Gipson's statements were voluntary.

For the reasons explained,

**IT IS RECOMMENDED** that Gipson's Motion to Suppress (ECF No. 53) be **DENIED.**

DATED this 15th day of September, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

25